Sharri Levy, a minor, by her parents and next friends, Richard and Jeannette Levy, Petitioners *v.* Commonwealth of Pennsylvania, Department of Education, Respondent.

Argued December 8, 1978, before Judges Rogers, DiSalle and Craig, sitting as a panel of three.

*Steven S. Goldberg,* with him *Janet F. Stotland,* for appellant.

*John A. Alzamora,* Assistant Attorney General, for appellee.

OPINION BY JUDGE DiSALLE, March 23, 1979:

This case is before us because of the inability of the local school district and intermediate unit, on the one hand, and the Department of Education, on the other, to agree on the precise nature of Sharri L.'s mental disability. Their disagreement has placed this child (now 16 years of age) between the Scylla of mental retardation and the Charybdis of brain injury. The situation stems from the fact that those who are responsible for the operation of our educational system apparently feel that before they can solve this problem, they must first find a label for Sharri.

Sharri had been attending the Parkway Day School, a private school for brain injured children, since September, 1969. In 1976, Sharri's parents requested the local school authorities to find an alternate placement for their daughter as she was approaching secondary school age and the Parkway Day School was relocating to other facilities a considerable distance away from its former location. The Lower Merion School District (School District), with the Montgomery County Intermediate Unit (Intermediate Unit) concurring, determined that Sharri was ''brain injured'' and recommended her for placement in the Vanguard School (Vanguard). Vanguard is approved by the Department of Education for the special education of brain injured children.[1] Sharri's mother approved

---

[1] Sections 1371 and 1372 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§13-1371, 13-1372, require that all handicapped school-aged children be provided with an appropriate education. If the local school dis-

this educational assignment on August 25, 1976, and Sharri was enrolled and began attending Vanguard on September 8, 1976.

The School District thereafter forwarded a completed application, together with its favorable recommendation, to the Department of Education (Department) requesting approval of the placement. This application was received by the Division of Special Education (Division) of the Department on September 22, 1976. Following a review of the application, the Division rendered a decision on September 24, 1976, disapproving the recommended placement. Thereafter, on October 8, 1976, the Secretary of Education (Secretary) issued an Order to Show Cause why the placement of Sharri should not be disapproved. Hearings were held on January 13 and January 17, 1977. Subsequently, in an Opinion and Order dated May 20, 1977, the Secretary determined that Sharri was ''mentally retarded'' and therefore not a

---

trict and the intermediate unit are unable to meet a child's educational needs in a public school program of special education, they may request placement for the child in a private school approved by the Department of Education. 22 Pa. Code §§13.11(b), 171.13. The placement must be made in accordance with the applicable provisions of the School Code and the Department's regulations and standards. Section 1376 of the School Code, 24 P.S. §13-1376; 22 Pa. Code §13.1 et seq.; 22 Pa. Code §171.11 et seq.; *General Standards for Special Education Programs and Services for Exceptional Children.* These require that the prior approval of the Department be obtained. The statutory provisions, regulations, and standards authorize the Department to disapprove the placement if the following conditions are not met: the reports accompanying the district's application must support the district's determination of the child's disabling condition; the district and the intermediate unit must be unable to provide an educational program for the child; the private facility must have a special education program approved by the Department of Education for the child's specific condition; and the private school program must be able to meet the educational needs of the child.

proper candidate for placement in Vanguard. It is from this decision that the instant petition for review was filed.

In reviewing the Secretary's adjudication, we are required to affirm the decision unless a violation of constitutional rights has occurred, an error of law has been committed, or the findings of fact are not supported by substantial evidence. 2 Pa. C.S. §704. Applying this standard to the instant case, our inquiry is limited to whether the Secretary's determination that Sharri is mentally retarded is supported by substantial evidence.

The Department, in defending this classification, places much, if not sole, reliance on the results of Sharri's intelligent quotient (IQ) tests. On the WISC verbal scale she attained an IQ of 65. Consequently, it is argued that under the IQ criteria set forth in the *General Standards for Special Education Programs and Services for Exceptional Children (Standards)*, Sharri must be considered retarded.[2] We do not agree. The *Standards* promulgated by the Department define educable mentally retarded children as ''those who are significantly impaired in their adaptive behavior as a result of subaverage general intellectual functioning which originates during the formative years of life and is associated with impairment of one or more of

[2] The Department argues: "By the I.Q. criteria set forth in the *Standards*, Sharri must be considered to be retarded. Plainly then she does not qualify as a brain injured/learning disabled pupil. The I.Q. scores included in the record constitute substantial evidence and provide sufficient grounds for the Secretary's rejection of the placement application. The appellant has, however, contested reliance upon I.Q. scores alone as being a proper basis for determining that a child is mentally retarded. . . . Nevertheless, I.Q. scores-are what the cited section of the *Standards* utilizes for categorizing a child as mentally retarded. I.Q. scores are therefore the proper regulatory criteria."

the following: 1. learning 2. maturation 3. social adjustment.'' Notwithstanding this comprehensive definition, the Department places reliance upon only one of the requirements enunciated for eligibility for admission to classes for such children; namely, that which provides ''[t]he IQ of a pupil may not exceed 80, including the standard error of measurement.'' Clearly, this standard was not intended to classify all children with IQ's of less than 80 as mentally retarded. It merely relates to the placement in special programs of those children previously determined to be mentally retarded. As noted, the definition of mental retardation contained in the *Standards* makes no reference to IQ test results. While it is true that IQ scores evidence a certain level of intellectual capability, certainly they should not be relied upon—to the exclusion of other medically recognized and accepted factors—to classify a person as mentally retarded. Furthermore, neither of the two witnesses who testified on behalf of the Department and who made the initial determination that Sharri was mentally retarded placed any reliance on the results of her IQ scores. We must conclude, therefore, that IQ test results do not, in and of themselves, constitute substantial evidence upon which to base a finding of mental retardation.

In light of this conclusion, we have examined the remaining portions of the record to see whether other evidence exists to support the Secretary's finding. Testifying on behalf of the Department were the program supervisor of the mentally retarded program in its Division of Special Education, and the chief of special education programs and services in its Bureau of Special and Compensatory Education. Nowhere in their testimony, nor in that presented elsewhere in the record, is there an unequivocal statement that Sharri's disability is definitely a result of mental re-

tardation.[3] On the other hand, all of the expert witnesses who testified in Sharri's behalf agreed that her handicap was not attributable to mental retardation. Indeed, there was uniform agreement among them that the proper characterization of Sharri's affliction should be brain injured or learning disabled.[4] (The term "learning disabled" was used interchangeably with the term "brain injured" by these specialists.) As we view the record, then, not only was there an absence of substantial evidence to support a finding that Sharri is mentally retarded, there was a blatant disregard of competent evidence establishing that she is not mentally retarded, but is, in fact, brain injured.

The final question we must consider is whether the School District and Intermediate Unit gave proper consideration to Sharri's placement in a public school program of special education. The Department's regu-

---

[3] The Department's brief summarizes this evidence as follows: "Thus, it is stated that: Sharri has 'cognitive limitations' and measures 'as a mentally deficient child' [R. 279a]; there are 'some inherent limitations to the youngster's cognitive capacity and that her thinking ability tends to be delimited and concrete' [R. 283a]; 'It is clear that her thinking is concrete, that complex thought operations are difficult for her to negotiate and that discriminative and integrative thinking is restricted' [R. 283a]; she has 'innate restrictions in regard to capacity for cognitive operations' [R. 284a]; she has been diagnosed as suffering from an intellectual deficit [R. 285a]; Sharri's low I.Q. scores are 'representative of Sharri's intellectual potenial', 'Sharri's ability to think analytically and synthetically fell within the Mental Defective Range' . . .; abstract reasoning 'seems to be beyond Sharri's grasp at the present time' [R. 318a]; Sharri suffers from 'mild mental retardation' . . . ."

[4] Representative of their opinions was the following statement by Dr. Patricia M. Bricklin who testified: "I don't see anything in the data that has been available to me that speaks to subaverage general intellectual functioning which originates during the formative years of life. . . . The I.Q. scores in my opinion are not a result of subaverage general intellectual functioning which originates during the formative years of life."

lations found at 22 Pa. Code §§13.9, 13.11(d), 171.13, and 171.16(c), establish a priority order of placement in determining where a child should be educated and rank these alternatives as follows:

1. A regular class in a regular school with supporting services.

2. A school district special education program in a regular school, including homebound instruction.

3. A school district special education program in a special facility.

4. An intermediate unit program in a regular school.

5. An intermediate unit program in a special facility.

6. An approved private school program.

7. A State school program.

8. An approved out-of-state program.

The Department argues, therefore, that even assuming Sharri to be brain injured, her assignment to Vanguard was improper since her special education needs could be provided for by the public schools. Again, we are compelled to disagree, based on the facts of this particular case.

There is an abundance of expert testimony suggesting that to place Sharri in a public school program, even if it were supplemented by individualized attention, would be deleterious to her educational, social, and emotional well-being. These experts noted that prior to her placement in Vanguard, Sharri was not attaining her intellectual potential. However, after she began attending Vanguard, a dramatic change in her behavior occurred. Rather than continuing to be withdrawn, anti-social, and unable to understand or cope with her limitations, she began to maintain friendships, involve herself in extra-curricular activities, and deal effectively with her handicaps. They

strongly emphasized that, to transfer her involuntarily from a setting which was obviously a major factor in her improvement, to the public school system, would cause her once again to withdraw, isolate herself, and regress.[5] In light of this, we believe that for the Department to, in effect, insist that Sharri attend classes at the public school, is both inimical to her interests and an example of unreasonable adherence to bureaucratic regulations. We recognize that these decisions are not easy. We also realize that it is important, if not imperative, to have uniform standards to guide the Department in making these sensitive determinations. But we cannot condone blind adherence to these standards when the nature of the decision itself requires judgment and discretion, and when there exists such a grave danger of disrupting and perhaps even

---

[5] In this regard, we find the testimony of Dr. Viktoria M. Possoff, Sharri's private psychiatrist, to be particularly persuasive. In a report dated January 7, 1976, Dr. Possoff made the following observations concerning Sharri's placement at Vanguard:

When arrangements were made for Sharri to attend Vanguard, she viewed this very positively and, in spite of her fear of new situations, felt optimistic about the change. . . . .

Since Sharri has been at Vanguard, there has been progressive improvement. In our sessions now, I see a cheerful hopeful young girl who talks about her friends and her extra-curricular activities; explores her feelings and ways to improve interpersonal relationship; and, for the first time, is beginning to understand and deal with her limitations. . . .

This social and emotional growth that Sharri is making is new and far from solidified. It is very much dependent on environmental conditions. At Vanguard, Sharri has found an environment uniquely suited to her needs in the make-up of the school population and the types of activities available. *Most certainly, if Sharri is involuntarily transferred from Vanguard to a class for mentally retarded children at another school, she again will withdraw, isolate herself and regress.* (Emphasis added.)

destroying any chance children such as Sharri might have for leading useful and productive lives.[6]

In conclusion, we hold the Secretary's finding that Sharri is mentally retarded to be unsupported by subsantial evidence and that her refusal to approve the recommended placement for Sharri at the Vanguard School was improper. Accordingly, we reverse.

## ORDER

AND Now, this 23rd day of March, 1979, the order of the Secretary of Education, dated May 20, 1977,

---

[6] Dr. Karl Menninger, world-renowned as an expert in the field of psychiatry, has cautioned against the possible harmful effects that pedantic labeling has had on those afflicted by mental illness:

In the early part of the century the object of psychiatry was primarily to identify and distinguish the forms and evidences of mental illness. . . . We dutifully employed historic designation and historic conception associated with them. . . . *Our concern now is not so much what to call something as what to do about it.*

. . . .

. . . The object of the process of diagnostication . . . is . . . to provide a sound basis for formulating a *treatment* program, a planned ameliorative intervention.

For this process current nosologies and diagnostic nomenclature are not only useless but restrictive and obstructive. *This does not mean the discarding of useful terminology or syndrome appellations.*

The pragmatic point in the whole matter hinges upon the effect that labeling is apt to have upon those who might bring about improvement in the patient were they not deterred by the implications of the label. This means not only the physicians but his relatives and friends, the community at large, and even the patient himself.

. . . .

. . . Diagnosis must examine and identify and describe the nature and course of the illness in such a way that effective treatment can be instituted. (Emphasis in original.)

Menninger, *The Vital Balance*, 2, 33, 46, 48 (1963).

disapproving the enrollment of Sharri Levy at the Vanguard School, is hereby reversed.